N.C. Dep't of Revenue v. First Petroleum Servs., Inc., 2018 NCBC 19.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 17 CVS 1663 |

| | |
|---|---|
| N.C. DEPARTMENT OF REVENUE,<br><br>    Petitioner,<br><br>v.<br><br>FIRST PETROLEUM SERVICES, INC.,<br><br>    Respondent. | **ORDER AND OPINION ON<br>PETITION FOR JUDICIAL REVIEW** |

1. This matter is an appeal in a contested tax case. The issue is whether Respondent First Petroleum Services, Inc. ("First Petroleum") must pay a use tax on materials it purchased and used in fulfilling contracts to construct and install fuel storage tanks and related equipment. The Office of Administrative Hearings held that the relevant contracts were not subject to the use tax and granted summary judgment in favor of First Petroleum. The North Carolina Department of Revenue ("Department") petitions for judicial review of that administrative final decision.

2. For the reasons given below, the Court **REVERSES** the decision of the Office of Administrative Hearings and **REMANDS** with instructions to grant summary judgment in favor of the Department.

> *North Carolina Department of Justice, by Assistant Attorney General Andrew O. Furuseth, for Petitioner North Carolina Department of Revenue.*

> *Stevens Martin Vaughn & Tadych, by Michael J. Tadych, for Respondent First Petroleum Services, Inc.*

Conrad, Judge.

# I.
# BACKGROUND

3. Both parties moved for summary judgment before the Office of Administrative Hearings. The material facts are undisputed.[*]

4. First Petroleum sells and installs petroleum fueling equipment. (*See* R.24; R.263.) About half of First Petroleum's business involves retail sales to customers (such as sales of replacement parts). (*See* R.264–65.) The other half of its business consists of contracts for construction and installation of fuel tanks, fueling islands, and similar fuel storage and delivery systems. (*See* R.265–67.) The tax assessment in this case concerns the latter.

5. The Department conducted a sales and use tax audit of First Petroleum for the period April 1, 2009 to March 31, 2012. (*See* R.48.) Its review centered on eleven contracts ("FPS Contracts"), each of which is similar in relevant respects. (*See* R.295 (describing contracts as "representative examples"); *see also* Pet. for Judicial Review 2 n.1, ECF No. 1.) The subject matter of each contract is the installation of a fuel storage and delivery system on property owned by a governmental entity, such as a municipality or federal agency. (*See, e.g.*, R.334, 338, 361, 388–89, 406–07, 419.) First Petroleum agreed to furnish the necessary labor, materials, and equipment to perform its services, including supervision of the work and related site-management services. (*See, e.g.*, R.472, 519, 520, 646, 731–33, 906–07, 1228, 1244, 1249, 1277–78, 1518, 1522–23; *see also* R.314, 334–35; R.683.) It performed these activities subject

---

[*] The appeal record appears at ECF Nos. 21 through 31.

to compliance with detailed specifications provided by the primary contractor or the property owner. (*See, e.g.*, R.470–71, 473–98, 519, 521, 527–42, 840–41, 1239–54; *see also* R.589–96.) The FPS Contracts also generally task First Petroleum with responsibility for permits, fees, and taxes, as well as any liability for injuries or loss on the job site. (*See, e.g.*, R.472, 646, 737–38, 896–920, 1277, 1519–20, 1530; *see also* R.335, 685.)

6. A representative contract concerns the construction and installation of a gasoline storage and dispensing system at Fort Bragg, North Carolina. (*See* R.519.) Serving as a subcontractor, First Petroleum agreed "to furnish all necessary labor and material, tools, [and] equipment," to "furnish and erect scaffolding," and to handle "all power transportation, hauling, loading and unloading, demolition, floor cutting & patching and all other incidentals necessary for the compete installation" of the system. (R.519; *see also* R.329.) The contract sets forth detailed instructions regarding various system components, including materials to be used, drawings and specifications, and procedures for requesting to deviate from the approved specifications. (*See* R.473, 526, 547, 1528.) First Petroleum remained responsible for all state taxes and any and all loss due to theft or other misappropriation. (*See* R.331–32, 1530.)

7. As a result of the audit, the Department found that First Petroleum failed to pay a use tax for the building materials that it purchased and then used to perform the FPS Contracts. (*See* R.48.) The Department issued a proposed assessment of use tax, penalties, and interest. (*See* R.49.)

8.     In response, First Petroleum did not argue that it had, in fact, paid sales or use tax on the materials used to perform the FPS Contracts. Rather, it argued that it was not required to do so. First Petroleum opposed the use tax assessment on the ground that the FPS Contracts were better characterized as retail sales of equipment, not taxable uses of building materials. (*See, e.g.*, R.24.) And it denied incurring any sales tax liability because its customers (government entities) were exempt. (*See, e.g.*, R.24.)

9.     The Department disagreed with both arguments. In its Notice of Final Determination, the Department concluded that First Petroleum's transactions were not exempt from tax. In certain circumstances, items purchased by government entities are exempt, but these exemptions "do not apply if the items were used by [a] contractor in the performance of a contract." (R.50 (citing 17 N.C. Admin. Code 07B.1701(a), (c) & 07B.4203).)

10.     The Department further "determined that the [FPS Contracts] contained the elements of a performance contract rather than a sales transaction." (R.50.) In reaching that conclusion, the Department relied on the use tax statute and its regulations interpreting the statute. (*See* R.49 (citing N.C. Gen. Stat. § 105-164.6(a)(1) & 17 N.C. Admin. Code 07B.2602(a)).) Having concluded that First Petroleum was the consumer of the materials used to perform the FPS Contracts, the Department upheld the proposed assessment for unpaid use tax.

11. First Petroleum timely filed a Petition for Contested Hearing in the Office of Administrative Hearings. (*See* R.23.) The parties cross-moved for partial summary judgment.

12. After a hearing, the Administrative Law Judge ("ALJ") issued a Final Decision granting First Petroleum's motion and denying the Department's. (*See* R.19.) The ALJ based that decision on language in Sales and Use Tax Technical Bulletin 31-1 ("Bulletin 31-1"), a publication provided by the Department pursuant to its statutory authority to interpret the sales and use tax statutes. The ALJ construed Bulletin 31-1 to mean that "the critical issue here involves the level of control by parties to a construction contract." (R.17 ¶ 84.) After reviewing the FPS Contracts, the ALJ concluded that "the method, manner and means of completing" the contracts "are within the control of the owner," not First Petroleum. (R.14.) On that basis, the ALJ concluded that "the 'overall tenor' of" the contracts "does not allow [First Petroleum] to simply supply a finished product" and, therefore, that "the subject contracts are not performance contracts" but are instead retail sales contracts "as a matter of law." (R.14.)

13. The ALJ also rejected the Department's alternative request to change the basis for its assessment to the sales tax in the event the materials used in performing the FPS Contracts were determined not to be subject to the use tax. The ALJ concluded that "the statute of limitations for making a separate assessment based on the sales tax has long since passed." (R.16 ¶ 77.) Accordingly, the ALJ held that no

additional tax was due for material purchased in connection with the FPS Contracts. (*See* R.19.)

14. The Department filed its Petition for Judicial Review on February 9, 2017 and its opening brief on April 24, 2017. First Petroleum and the Department filed their response and reply briefs, respectively, on June 29 and July 12, 2017. The Court held a hearing on August 24, 2017, at which all parties were represented by counsel. In response to a request from the Court at the hearing, the parties prepared an electronic version of the record, which First Petroleum filed on October 12, 2017. This matter is ripe for determination.

II.
STANDARD OF REVIEW

15. When a "trial court exercises judicial review of an agency's final decision, it acts in the capacity of an appellate court." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 662, 599 S.E.2d 888, 896 (2004). "The nature of the error asserted by the party seeking review dictates the appropriate manner of review." *Dillingham v. N.C. Dep't of Human Res.*, 132 N.C. App. 704, 708, 513 S.E.2d 823, 826 (1999); *see also* N.C. Gen. Stat. § 150B-51(c).

16. Here, the Department appeals the order of the Office of Administrative Hearings granting summary judgment in favor of First Petroleum. "Appeals arising from summary judgment orders are decided using a de novo standard of review." *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 257, 794 S.E.2d 785, 791 (2016). "*De novo* review requires a court to consider a question anew," *Smith v. Richmond Cty. Bd. of Educ.*, 150 N.C. App. 291, 295, 563 S.E.2d 258, 263 (2002), and to "freely

substitute[] its own judgment for" that of the Administrative Law Judge, *Carroll*, 358 N.C. at 660, 599 S.E.2d at 895. "In reviewing a final decision allowing . . . summary judgment, the court may enter any order allowed by . . . Rule 56." N.C. Gen. Stat. § 150B-51(d).

17. It bears noting that the Final Decision includes a section labeled "Finding of Facts." (R.7–12.) Although neither party takes issue with this aspect of the Final Decision, our courts "have on numerous occasions held that it is not proper to include findings of fact in an order granting summary judgment." *Winston v. Livingstone College, Inc.*, 210 N.C. App. 486, 487, 707 S.E.2d 768, 769 (2011). The ALJ's purported findings are therefore not binding in this appeal, and the Court does not review them deferentially.

18. Rather, the Court must determine de novo whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). Summary judgment is appropriate if "the facts are not disputed and only a question of law remains." *Wal-Mart Stores East v. Hinton*, 197 N.C. App. 30, 37, 676 S.E.2d 634, 641 (2009) (quoting *Carter v. West Am. Ins. Co.*, 190 N.C. App. 532, 536, 661 S.E.2d 264, 268 (2008)). In this appeal, because the material facts are undisputed, "a summary disposition of the claims is proper and appropriate." *Technocom Bus. Sys. v. N.C. Dep't of Revenue*, 2011 NCBC LEXIS 1, at *12 (N.C. Super. Ct. Jan. 4, 2011).

## III.
## ANALYSIS

19.     The Department contends that the ALJ's decision "allows the property at issue to be untaxed," contrary to the purpose of the sales and use tax statutes. (Pet'r's Br. 2 ["Dept. Br."].)  In its view, the materials used to perform the FPS Contracts were subject to the use tax under the plain language of the governing statute and the regulations interpreting the statute. (*See* Dept. Br. 12–18.)  In the alternative, the Department contends that, assuming the FPS Contracts were retail sales, the ALJ should have permitted it to change the basis for its assessment from the use tax to the sales tax. (*See* Dept. Br. 19–23.)

20.     First Petroleum responds that the ALJ was correct on both counts.  It contends that the "sole issue" is whether the FPS Contracts "were 'performance contracts' under" Bulletin 31-1 and that the ALJ correctly concluded they were not. (Resp't's Br. 2, 6–21 ["Opp'n"].)  First Petroleum also argues that the Department based its assessment solely on the use tax, never changed the basis to the sales tax, and cannot change the basis for the assessment now. (*See* Opp'n 21–25.)

21.     For the reasons discussed below, the Court agrees with the Department that First Petroleum incurred liability for use tax on materials it purchased and then used to fulfill its contracts for the construction and installation of fuel storage and delivery systems within North Carolina.  As a result, the Court need not and does not decide whether the Department has statutory authority to change the basis for its assessment from the use tax to the sales tax.

## A. The Department's Assessment Was Correct.

22. The Sales and Use Tax Act imposes complementary sales and use taxes, which "often bring about the same result" but "'are assessments upon different transactions and are bottomed on distinguishable taxable events.'" *In re Assessment of Taxes Against Village Publishing Corp.*, 312 N.C. 211, 214, 322 S.E.2d 155, 158 (1984) (quoting *Atwater-Waynick Hosiery Mills, Inc. v. Clayton*, 268 N.C. 673, 675, 151 S.E.2d 574, 576 (1966)). "A sales tax is assessed on the purchase price of property and is imposed at the time of sale." *Colonial Pipeline Co. v. Clayton*, 275 N.C. 215, 223, 166 S.E.2d 671, 677 (1969). It is "designed to be passed on to the consumer." *Village Publishing Corp.*, 312 N.C. at 214, 322 S.E.2d at 158.

23. On the other hand, the "use tax is assessed on the storage, use or consumption of property and takes effect only after such use begins." *Colonial Pipeline*, 275 N.C. at 223, 166 S.E.2d at 677. Its "purpose" is "to impose a use tax, credited with any sales tax previously paid, upon the user of any tangible personal property in this state." *Oscar Miller Contractor, Inc. v. N.C. Tax Review Bd.*, 61 N.C. App. 725, 729, 301 S.E.2d 511, 513 (1983).

24. The texts of the sales and use tax statutes reflect these complementary goals. In general, the State's sales tax applies to a "retailer's net taxable sales or gross receipts." N.C. Gen. Stat. § 105-164.4. A "sale" broadly includes the "transfer" of tangible personal property "for consideration." *Id.* § 105-164.3(36).

25. By contrast, the use tax applies to "[t]angible personal property . . . purchased inside or outside this State for storage, use, or consumption in this State."

*Id.* § 105-164.6. This "includes property that becomes part of a building or another structure." *Id.* The term "use" is broadly defined to "include[] withdrawal from storage, distribution, installation, affixation to real or personal property, and exhaustion or consumption of the property or service by the owner or purchaser." *Id.* § 105-164.3(49).

26.    The interpretive difficulty here arises from the fact that First Petroleum uses construction materials by incorporating them into large-scale improvements on real property but also transfers title to the completed job to the property owner. First Petroleum views these transactions for consideration as retail sales. The Department, on the other hand, contends that the use of construction materials in the performance of contractual obligations makes First Petroleum a consumer of those materials, not a retailer.

27.    Precedent in this area, although not abundant, is instructive. Our courts have traditionally treated contractors as the user of building materials when constructing structures and other improvements on real property. Thus, the North Carolina Supreme Court rejected the "ingenious" argument that "heating and plumbing contractors who buy materials and supplies for use in fulfilling lump-sum contracts" were engaged in the resale of those supplies. *Atlas Supply Co. v. Maxwell*, 212 N.C. 624, 626–27, 194 S.E. 117, 117–18 (1937). Rather, "[t]hey purchase the materials and supplies, not for resale as tangible personal property, but for *use* in producing the turn-key job"—that is, incorporating the materials into a functioning heating or plumbing system. *Id.* at 627, 194 S.E. at 118 (emphasis added); *compare*

*In re Rock-Ola Café*, 111 N.C. App. 683, 685, 433 S.E.2d 236, 237 (1993) (holding that bar snacks and matches offered by a restaurant to its customers "are not subject to a use tax because the items were purchased [by the restaurant] for resale").

28. Similarly, the North Carolina Court of Appeals held that lumber and related materials used to construct warehouses and other buildings on farms were subject to the use tax. *See Morton Bldgs., Inc. v. Tolson*, 172 N.C. App. 119, 120, 615 S.E.2d 906, 908 (2005). The case addressed an earlier, though similar, version of section 105-164.6, which imposed a use tax "on the purchase price of tangible personal property purchased inside or outside the State that becomes a part of a building or other structure in the State." N.C. Gen. Stat. § 105-164.6(b) (2003). The Court of Appeals reasoned that the plain language of the use tax statute applied to the building materials at issue "because the materials, which are tangible personal property, became 'part of a building or other structure in the State.'" *Morton Bldgs.*, 172 N.C. App. at 123, 615 S.E.2d at 910. Furthermore, "[b]y incorporating the lumber and other materials petitioner purchased into the buildings petitioner constructed in North Carolina, petitioner exercised a right, power, and dominion over, and therefore *used* the . . . materials." *Id.* at 124, 615 S.E.2d at 910 (emphasis in original).

29. What flows from these cases is a reasonably defined standard for distinguishing between a use and a sale, at least as those terms apply to the activities of contractors. There is a clear difference, for example, between the transfer of property for the purpose of eventual resale and the use of property to perform a turn-key job. The former typically falls in the category of a retail sale, and the latter is

deemed a use. The distinction is especially clear when a contractor purchases construction materials and then incorporates them into a building or other structure in the course of performing the contract. Our courts have treated such activities as the performance of a job (subject to the use tax) rather than the sale of the specific materials at issue (subject to the sales tax).

30. This understanding of section 105-164.6 is further supported by the Department's interpretation of the statute, as stated in the North Carolina Administrative Code and in published bulletins. "The interpretation of a revenue law adopted by the agency charged with its enforcement is a significant aid to judicial interpretation of the same provision." *Jefferson-Pilot Ins. Co.*, 161 N.C. App. 558, 560–61, 589 S.E.2d 179, 181 (2003). "An interpretation by the Secretary is prima facie correct," N.C. Gen. Stat. § 105-264(a), as well as "strongly persuasive" and "entitled to due consideration," *Midrex Techs.*, 369 N.C. at 260, 794 S.E.2d at 793 (citation and quotation marks omitted).

31. During the relevant period, the Department consistently advised that "[c]ontractors are considered the *consumers* of tangible personal property they use in fulfilling contracts and are liable for payment of applicable statutory State and local sales or use taxes on the property." 17 N.C. Admin. Code 07B.2602(a) (2012) (emphasis added); *see also* 17 N.C. Admin. Code 07B.2607. In Sales and Use Tax Bulletin 31-1, which specifically addresses "Contractors and Building Materials," the Department repeated this guidance, advising that it deems contractors "to be

*consumers* of tangible personal property which they use in fulfilling performance contracts." N.C. Sales & Use Tax Bulletin § 31-1 ["Bulletin"] (emphasis added).

32.     Bulletin 31-1 goes on to explain the factors that are relevant to determining whether a transaction is a performance contract as opposed to a retail sale:

> "In order to establish if a transaction constitutes a performance contract, the tenor of the agreement is for the contractor to perform a job, retaining the right to control the means, the method, and the manner of accomplishing the desired result. A performance contract does not provide for a sale of specific items; rather, the contractor agrees to furnish the necessary materials, labor, and expertise to accomplish the job. With a performance contract, responsibility for the job and title to the materials purchased by the contractor remain with the contractor until the job is completed and accepted by the purchaser/owner. The contractor is liable for accidents or injury at the job site and loss or damage due to vandalism, neglect, theft, and fire."

*See* Bulletin § 31-1.

33.     Thus, under the interpretation adopted by the Department, the general rule is that contractors using tangible personal property to fulfill their contracts are the *users* or *consumers* of that property. A "sale of specific items" is treated as a retail sale. By contrast, the use of materials in the course of fulfilling an agreement "to perform a job"—in which "the contractor agrees to furnish the necessary materials, labor, and expertise to accomplish the job"—is a statutory use, subject to the use tax. Put another way, the distinction drawn by the Department is the same distinction drawn by *Atlas Supply* and *Morton Buildings*.

34.     Here, under both the plain language of the statute and the governing regulations, the undisputed evidence shows that First Petroleum's activities fall on the use side of the line. The FPS Contracts do not identify specific items for sale. Rather, they define a scope of work—a job to be performed. First Petroleum agreed

to construct large-scale improvements to real property. To perform its obligations, First Petroleum purchased necessary materials, incorporated those materials into fuel storage and dispensing systems, and transferred to each property owner a completed, functioning system. In doing so, First Petroleum "exercised a right, power, and dominion over, and therefore *used* the . . . materials." *Morton Bldgs.*, 172 N.C. App. at 124, 615 S.E.2d at 910 (emphasis in original); *see also id.* at 123, 615 S.E.2d at 910 ("materials . . . became 'part of a building or other structure in the State'"); N.C. Gen. Stat. § 105-164.6(a)(1) (imposing use tax on tangible personal property that becomes "part of a building or other structure" in North Carolina).

35.    As a result, the Department's assessment of use tax was correct. Summary judgment in favor of the Department is appropriate.

B.  The Final Decision's Application of Bulletin 31-1 Was Erroneous.

36.    The ALJ's Final Decision reached a different conclusion solely on the basis of language in Bulletin 31-1. This decision was erroneous for three reasons.

37.  First, this dispute ultimately concerns a question of statutory interpretation, for which the starting point must be the statute's text and relevant precedent. The Final Decision neglects both. It is noteworthy that First Petroleum, in defending the Final Decision, does not address or distinguish *Atlas Supply* or *Morton Buildings*. Nor does it cite any contrary case law treating the use of building materials to perform a construction contract as a retail sale. In short, First Petroleum provides no basis to conclude that the Final Decision's reasoning is consistent with precedent or the traditional application of sales tax and use tax in this context.

38. While briefly addressing the statute in its opposition brief, First Petroleum insists "that often it is not clear whether a transaction at issue is a use or a sale" and that "not every affixation of tangible personal property to real property is a taxable use." (Opp'n 5 n.2.) But to resolve this dispute, the Court need not decide whether *every* affixation of tangible personal property results in a taxable use. (This case is not about, for example, the sale of carpeting or a home appliance with ancillary installation services, for which tax treatment may be different.) The issue is much narrower: whether First Petroleum's use of construction materials in erecting and installing fuel structures on real property is a taxable use. The plain language of the statute and the holdings of *Atlas Supply* and *Morton Buildings* confirm that it is, and the Department's administrative guidance is consistent with both.

39. Second, the ALJ failed to read Bulletin 31-1 as a whole. According to the ALJ, Bulletin 31-1 "draws a distinction between those construction contracts in which the contractor determines the method, manner and means of completing the final project and those in which the owner determines the method, manner and means of completing the final project." (R.15 ¶ 69.) The ALJ treated this distinction as the "critical issue," (R.17 ¶ 84), and First Petroleum doubles down on the point, referring to it as the "gravamen" or "ultimate test" for distinguishing between taxable sales and taxable uses, (Opp'n 8).

40. This cramped interpretation is not supported by the language of Bulletin 31-1. Fairly construed, the Bulletin frames the inquiry as whether "the tenor of the agreement is for the contractor *to perform a job*, retaining the right to control the

means, the method, and the manner of accomplishing the desired result." (R.97 (emphasis added).) Bulletin 31-1 describes several factors to consider in making that determination, including whether the contractor (i) "agrees to furnish the necessary materials, labor, and expertise to accomplish the job"; (ii) retains "responsibility for the job and title to the materials . . . until the job is completed and accepted"; and (iii) "is liable for injury at the job site and loss or damage."

41. It is undisputed these factors are met here. (*See* Opp'n 18–19 & n.11.) First Petroleum agreed to furnish the necessary materials, labor, and expertise; title remained with First Petroleum until the job was done; and First Petroleum was liable for accidents, injuries, or loss. Furthermore, as discussed, there is no way to read the contracts as a "sale of specific items" rather than a contract "to perform a job." Taken together, the factors deemed relevant by the Department in Bulletin 31-1 strongly support its conclusion that First Petroleum agreed to perform a job, retaining the right to control the means, method, and manner of performance.

42. Yet the ALJ held these factors were entitled to no weight on the ground that the same "is true of virtually all construction contracts because the whole purpose of the contract is for the contractor to build something for the owner." (R.15 ¶ 68.) By doing so, the ALJ read the relevant factors out of the Bulletin altogether, divorcing the pertinent inquiry from the criteria that go into it. In the absence of a conflict with the governing statute, however, the ALJ and this Court must apply the regulation as written by the Department. No such conflict exists. The fact that certain factors apply to "virtually all construction contracts" is not a stain on the Department's

interpretation. It is consistent with longstanding precedent that treats the use of materials in the performance of a construction contract as subject to the use tax. The Department's interpretation therefore deserves due consideration.

43. Third, even putting aside the factors identified in the Bulletin, the Court agrees with the Department that First Petroleum retained control over the means, manner, and method of carrying out its contracts. To be sure, First Petroleum was required to comply with extensive "plans and specifications prepared by the owner's engineers and architects," among other restrictions. (Opp'n 9.) But the question is not whether the property owners exercised oversight as to the scope of work to be performed. (*See* R.272.) It is instead whether First Petroleum took responsibility for supplying the appropriate materials and expertise, supervising its workers, and carrying out the job. The undisputed evidence shows that it did. (*See, e.g.*, R.329, 519; *see also* R.1530 ("It is agreed that the Subcontractor is an independent contractor.").)

44. First Petroleum nevertheless argues that Bulletin 31-1 should be construed in its favor because it is "poorly crafted" and "virtually impossible for taxpayers to apply." (Opp'n 20.) Not so. For the reasons discussed above, Bulletin 31-1 is consistent with section 105-164.6 and appellate precedents applying the sales and use tax laws. Read as a whole, and in light of existing precedent, Bulletin 31-1 is neither ambiguous nor incapable of reasoned application. *See Carolina Photography, Inc. v. Hinton*, 196 N.C. App. 337, 341, 674 S.E.2d 724, 727 (2009) (applying Sales and Use Tax Technical Bulletin where consistent with precedent).

## C. The Department's Alternative Arguments Are Moot.

45. The Department also contends that the ALJ erred for two additional reasons. It argues, first, that the ALJ improperly prohibited the Department from changing the basis of its proposed assessment from the use tax to the sales tax. Second, the Department contends that the ALJ awarded relief to First Petroleum beyond what was requested in its petition for administrative review. Having concluded that the ALJ erred in granting summary judgment in favor of First Petroleum and in denying the Department's motion for summary judgment, the Court need not address these alternative arguments.

## IV.
## CONCLUSION

46. For these reasons, the Court **REVERSES** the Final Decision and **REMANDS** with instructions to enter partial summary judgment in favor of the Department. On remand, the Office of Administrative Hearings shall determine the amount of tax due.

This the 23rd day of February, 2018.

Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases